**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**RANDY L. ROHRBAUGH,**

               **Petitioner,**               **Civil Action No. 2:09cv39**
                                                  **Criminal Action No. 2:06cr19**
**v.**                                                       **(Judge Bailey)**

**UNITED STATES OF AMERICA,**

               **Respondent.**

**REPORT AND RECOMMENDATION THAT DEFENDANT'S ORIGINAL JUDGMENT BE VACATED AND RE-ENTERED SO THAT A NOTICE OF APPEAL CAN BE FILED**

## I. Introduction

On March 30, 2009, Petitioner filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody with a Memorandum in Support. (Dkt.# 107 and 109). On March 31, 2009 the Government was directed to respond. (Dkt.# 113).[1] On June 30, 2009, the Government filed its response (Dkt.# 125) along with a Motion to Dismiss. (Dkt.# 124). Instead of a reply or response to the motion to dismiss, on July 15, 2009, petitioner filed a Motion for Sanctions,[2] alleging the Government's failure to file a response, along with a Motion for Leave to Amend his § 2255 motion (Dkt.# 129).[3] On July 21, 2009 petitioner finally filed his reply, titled

---

[1] On April 30, 2009 the Government requested an extension of time in which to file its response (Dkt.# 119), which was granted by Order entered on May 8, 2009. (Dkt.# 120).

[2] Petitioner's motion for sanctions was titled as Petitioner's Objection to the Government's Failure to Comply with Court Order and Request for Sanctions. Apparently, on July 7, 2009, petitioner sent a letter to the Clerk (2:09cv39, Dkt.# 2) requesting a copy of his docket sheet. His letter showed a new return address without specifically identifying it as such. The letter was received and filed in his civil docket on July 10, 2010. The Clerk noticed the new address and updated petitioner's address on his criminal docket the same day. Because of the delay engendered by petitioner's failure to notify the Court of his change of address, the Government's June 30, 2010 response and motion to dismiss were sent to petitioner's old address. Petitioner apparently assumed the Government had not timely responded and filed the motion for sanctions.

[3] Petitioner's July 15, 2009 motion for leave to amend his § 2255 petition was granted by Order entered on November 10, 2009. (Dkt.# 137). In that same Order, petitioner's subsequent July 21, 2009 and July 27, 2009 requests for leave to amend (Dkt.# 132) and a duplicate copy of the same (Dkt.# 134), were denied as moot, as was his July 15, 2009 Objection to the Government's Failure to Comply with Court Order and Request for Sanctions. (Dkt.# 126).

1

Petitioner's Respnse [sic] to the Governments [sic] Answer to the 2255 Petition (Dkt.# 131), as well as a Response to the United State [sic] Motion to Dismiss 2255 Petition and Request for Leave to Amend § 2255 Petition (Dkt.# 132).[4]

Thereafter, on December 7, 2009, petitioner filed an amended Motion to Vacate Under 28 U.S.C. § 2255 (Dkt.# 146) along with a Memorandum in Support (Dkt.# 146-1). The Government filed its Response in Opposition on December 14, 2009 (Dkt.# 147). On December 21, 2009, petitioner replied to the Government in his Petitioners [sic] Response to the Governments [sic] Answer to Amended 2255 Petition. (Dkt.# 148).

On January 6, 2010, petitioner filed a Motion for Leave to Supplement Amended Motion to Vacate (Dkt.# 149) along with an attached Supplemental Motion to Vacate. (Dkt.# 149-1), which was granted by Order entered on January 13, 2010 (Dkt.# 150) and the attached Supplemental Motion to Vacate" was deemed to be the Second Amended Motion to Vacate, already filed.[5]

On January 27, 2010, the Government filed its Response in Opposition (Dkt.# 127) and on February 4, 2010, petitioner replied. (Dkt.# 153).

On August 25, 2010, the Government was directed to file a supplemental response to more fully address some of petitioner's § 2255 claims (Dkt.# 155) and did so on September 10, 2010. (Dkt.# 159). Petitioner replied on November 1, 2010.[6] (Dkt# 166).

On November 8, 2010, despite having been previously advised by the Court that no further

---

[4] On July 27, 2009, without explanation, petitioner also filed a duplicate copies of his original Petitioner's Respnse [sic] to the Governments [sic] Answer to the 2255 Petition (also containing a motion for leave to amend) (Dkt.# 134) and his Petitioner's Response to the United State [sic] Motion to Dismiss 2255 Petition and Request for Leave to Amend § 2255 Petition (Dkt.# 135).

[5] The attachment to the Motion for Leave to Supplement Amended Motion to Vacate, titled Supplemental Motion to Vacate, was deemed the petitioner's Second Amended Motion to Vacate because it set forth an additional ineffective assistance of counsel claim. Petitioner was advised by the Court that no further amendments or supplements would be granted to his § 2255 motion.

[6] Petitioner's reply to the Government's supplemental response was untimely because the Government's response went to his previous address. (Dkt.# 166 at 2). After petitioner's October 12, 2010 notice to the magistrate judge (Dkt.# 162) advised that he had not received it, a copy was re-sent.

amendments or supplements to his petition would be granted, petitioner filed a Motion to Supplement. (Dkt.# 167).

On November 15, 2010, a Report and Recommendation was entered, recommending that the § 2255 motion be denied as to all grounds but one, and setting an evidentiary hearing on the sole issue of whether petitioner instructed his counsel to file a notice of appeal. An evidentiary hearing was held on March 3, 2011. Testimony was taken from petitioner and from his former counsel, Jeffrey L. Freeman, Esquire.

## II. Facts

In this case, petitioner asserts that he requested his counsel file a notice of appeal at the conclusion of the sentencing hearing on April 24, 2008. He alleges that counsel promised to do so but then failed to keep in contact until after the expiration of the 10-day appellate period.

On July 13, 2006, petitioner signed a plea agreement in which he agreed to plead guilty to a one count Information with a forfeiture allegation: Count 1, conspiracy to possess with intent to distribute and to distribute more than five hundred grams of substances containing methamphetamine, in violation of Title 21, U.S.C. Sections 846 and 841(b)(1)(A). The plea hearing was held on July 13, 2006. The sentencing hearing was not held until almost two years later,[7] on April 24, 2008, in front of the late Honorable Robert E. Maxwell, United States District Judge. Near the conclusion of the hearing, Judge Maxwell explained petitioner's appellate rights and the procedure for filing an appeal *in forma pauperis*, advising petitioner that if he wished, the Clerk of Court would assist him or his counsel in the filing of a notice of appeal. Petitioner did not accept or acknowledge this offer. Petitioner admits he was so advised by the Court, but testified that at that time, because counsel was still his attorney, counsel should have been the one to do file the notice of appeal for him.

Petitioner asserts that immediately before his sentencing hearing, he learned for the first time

---

[7] Petitioner was released on post-plea bond in order to give him an opportunity to provide substantial assistance.

that the Government was not going to make its U.S.S.G. § 5K1.1 motion for substantial assistance. He denies asking counsel about an appeal at that time, stating that his first request to counsel to file an appeal was made immediately after the sentencing hearing, before he was led away by the Marshals to be returned to the Tygart Regional Jail. Petitioner contends that counsel responded "just keep in contact . . . and we'd go from there." Petitioner testified that he remained at the Tygart Regional Jail for seven days after sentencing, and during that time he attempted to phone counsel several times about the appeal, but that counsel's office blocks collect calls and he did not get through. Further, he contends that he had his mother, his children's mother, and his then-girlfriend also call counsel about the appeal during that time period. He testified that while still at the jail, he also wrote a letter to counsel requesting the appeal.[8]

He denies receiving any communication at all from counsel after those inquiries, regarding either his right to an appeal or counsel's representation of him, other than a phone conversation, initiated by him to counsel, approximately one month after he was sentenced. He states this was a collect call from the prison, which counsel did accept. He testified that the purpose of the call was to obtain copies of things from his file needed for other legal matters, but that he was irate with counsel about the 10-day period for the appeal having expired. He contends that counsel responded "well, as far as I'm concerned, after you were sentenced, you were no longer my problem."

He testified that his only other contact with counsel was a call he initiated to counsel just before he was transferred from the prison at Cumberland, but he could not recall the substance of that conversation. He asserts that the only other evidence to support his claim that he asked counsel to file the appeal were the affidavits[9] he provided from his parents and the mother of his children,

---

[8] He testified that he did not keep a copy of the letter because he did not realize at that time that he would need it; that in the past he did not routinely keep copies of correspondence sent; but that he now keeps copies of everything.

[9] Attached to petitioner's November 8, 2010 motion to supplement his § 2255 motion were four "Affidavit(s) in Support of Supplement." One was from petitioner, one was from a RoseAnn Carr, and there was one each from a Marvin O. Rohrbaugh and a Debora A. Rohrbaugh. By inference from information contained within petitioner's affidavit, confirmed by his testimony at the evidentiary hearing, these individuals are the mother of his

4

regarding their phone conversations with counsel regarding the appeal.

On cross-exam, petitioner at first testified that he had only briefly seen the Government's Exhibit 1, the proposed plea agreement, before he signed it. After some prodding, he admits he met with counsel to go over plea agreement; that he went over it "100 percent" with counsel before he signed it; and that counsel explained its waiver of appellate rights and the information about substantial assistance. He avers that he was aware of the 20-year mandatory minimum sentence before signing. However, he maintains he was led to believe that as long as he cooperated in providing substantial assistance, he would not receive the 20-year mandatory minimum. When confronted with Government's Exhibit 2, an April 24, 2008 letter from counsel to him, he admitted receiving it on Friday, April 25, 2008, the day after sentencing, while still incarcerated at the Tygart Regional Jail. The letter advised him that, *inter alia,* counsel's representation of him had concluded. Despite having received it, petitioner contends that he still wrote the letter to counsel asking him to file the appeal. He testified that he believes he sent the letter from the Tygart Regional Jail the following week. He testified that he did not learn that counsel was leaving his firm to join the prosecutor's office until some time after the 10-day period for the appeal had passed. He testified that he had an opportunity to review the presentence report ("PSR") with counsel in detail and frame his objections to it, but that he never discussed appealing any of the Court's adverse rulings on those objections with counsel. He reiterated his claim that he was unaware, until just before sentencing, that the Government did not intend to make the motion for substantial assistance. He testified that

---

children and his parents. The affidavits by the Rohrbaughs are notarized; the ones by petitioner and RoseAnne Carr are not. Carr's affidavit is also unsworn. Petitioner's affidavit states "When I was sentenced my lawyer turned to me and said he was sorry that [sic] he expected it to turn out differently. Because we had talked at the jail beforhand [sic] and he said he expected me to get around 135 months. I told him I wanted to appeal and he told me that we would, just keep in touch with him and we would do whatever I wanted to do**. I called him from the jail and was told he wasn't in several times**. Impatient as I am I had my childrens [sic] mother call on one ocassion [sic] and she got hold of him and she said that everything was ok we were going to appeal. I had my mother to call [sic] and he told her just to have me send him a letter of what I wanted him to do. **After I got to prison my counsler [sic] allowed me a call to my attorney and I asked him why he hadn't responded to my letter that I thought he was my attorney**. He said as far as he was concerned as soon as I was sentenced he was finished with my case." (Dkt. 167-1 at 2) (emphasis added).

5

counsel always assured him he would receive a 135-month sentence, instead of the 220-month mandatory minimum that he received. He reiterated his claim that the only time appealing the denial of the substantial assistance motion was discussed was immediately after the sentencing hearing.

Counsel testified that began his present employment with the Marion County Prosecutor's office in late May or early June of 2009. He reports that his representation of petitioner began in July 2005. He notes that during the time he represented petitioner, they met at his offices in Grafton and Fairmont, at different places within the city of Elkins, and after petitioner's post-plea bond was revoked, at various places where petitioner was incarcerated. He asserts that petitioner also called him "pretty regularly" during his representation, and occasionally sent letters as well. He testified that he did accept petitioner's calls when he was out of jail. However, he confirmed that his office had a collect call block for calls from the regional jail system because he did a high volume of criminal work that made screening jail calls difficult for his secretarial staff. It was his policy to instruct all his clients who were incarcerated in the jail to send him a letter requesting a call or visit, or have someone else call, and he would then set up a visit or arrange phone contact.

Mr. Freeman noted that the Government's changed position in moving for substantial assistance was prompted when recurrent issues with petitioner's behavior while on post-plea bond finally culminated in his arrest.[10] He testified that he advised petitioner, in several phone conversations over the course of the time between petitioner's re-arrest and sentencing, of the possibility that he might not receive his substantial assistance motion from the Government. He reports he informed petitioner once the Government advised that although it was looking unlikely the U.S. Attorney would permit them to make the motion, they were "still working on it."[11]

---

[10] The record reveals that petitioner's pre-trial release was finally revoked for the last time after he was arrested on May 30, 2007 for using a "Whizinator" to evade the substance abuse testing he was ordered to comply with on bond. (Dkt.# 50 at 2). Petitioner was not sentenced until eleven months later.

[11] He testified that "I knew it beforehand, and Randy knew beforehand that it was becoming unlikely, even if Mr. Warner [the AUSA] wanted to pursue it, or felt that he should file it, and give him some credit or reduction that he didn't think his boss who had to sign off on it would do so. And I don't recall specifically when he communicated to me that it was certain that he couldn't file it. It may have been a day or so before, it may have

6

He testified that he previously arranged to meet with petitioner at the Central Regional Jail in Flatwoods the day before the sentencing hearing, and that he called the day before to confirm that petitioner would still be there at the scheduled time. However, when he arrived at the jail early the next morning, the Marshals Service had already transported petitioner to Tygart Valley Regional Jail to await sentencing. Consequently, he was unable to meet with him until the following day.[12] He met with petitioner immediately before the sentencing hearing in a holding cell area at the Elkins Federal Building and described petitioner's demeanor as cordial and friendly but nervous. He testified that petitioner specifically asked if he were to get an unfavorable sentence "can we appeal?" He asserts that petitioner did not directly ask or instruct him to file an appeal, he only asked "could we?" He testified that he explained to petitioner that pursuant to the waiver in his plea agreement, petitioner had waived virtually every possible attack if he received a sentence within the statutory maximum. Further, he explained, because he was also a party to the plea agreement, having signed off on it with petitioner, he personally could not ethically pursue the appeal. However, another attorney, not a party to the agreement, could, because that attorney would not have participated in petitioner's waiver and might also be able to pursue an attack on counsel's effective representation. Mr. Freeman testified that he had a brief discussion with petitioner for five to ten minutes at counsel table in the courtroom immediately after the sentencing hearing. He noted that he asked the Marshals if he could speak privately with petitioner in the holding room again.[13] He testified that he then reiterated the same conversation with petitioner about having waived his appellate rights in the holding room that he had had with him there prior to the sentencing hearing, explaining that he he could not be the one to represent him on an appeal, but if he still wanted to

---

been the day of the hearing, but it was immediately preceding."

[12] He testified that he had other court proceedings scheduled that afternoon, precluding travel to Elkins.

[13] Further, he inquired of the Marshals whether petitioner would remain at the Tygart Valley Regional Jail for any length of time, or whether he would be returned immediately to Flatwoods. They advised that petitioner would remain at that location for at least the next day or two, enabling him to receive correspondence from counsel.

appeal, he needed to follow the procedure explained by the Court in the hearing. He reminded petitioner of the 10-day window of time. He described petitioner as "definitely agitated and upset" and testified that understandably, petitioner was somewhat "short" with him after sentencing. He noted that after he explained petitioner's rights and the fact that he needed to obtain other counsel if he wanted to appeal, petitioner did not tell him that he still wanted to file an appeal. He testified that petitioner only appeared unhappy; did not ask any detailed questions in response to his explanation; and that petitioner merely indicated his understanding by saying "OK" or nodding, abruptly terminating the conversation. He testified that he took that to mean that petitioner understood that he could not be the one to file an appeal for him. He had no specific recollection of directing petitioner to other appointed counsel or explaining to how to proceed *pro se* during this conversation, other than referencing the Court's earlier instruction, given at the end of the sentencing hearing, about how to appeal *in forma pauperis,* should he wish to do so.

Mr. Freeman testified that he obtained petitioner's file from "cold storage offsite" in preparation for the hearing. He believes he received the entire file and acknowledges that it contained his original notes. He reports taking extensive notes during the sentencing hearing and that the notes were given to his secretary afterwards to use in drafting the April 24, 2008 disengagement letter. He signed the letter. However, he reports that the portion of his notes regarding his advice to petitioner about his appellate rights was inadvertently omitted from the letter, because the notes continued onto the back of the page and his secretary overlooked that part. He testified that he did not notice that the section on advising petitioner of his appellate rights was inadvertently omitted until he recovered the file in preparation for the hearing. He testified that because most of his practice was in state court, his usual custom was to wait until he obtained a final order to send a letter of this type along with it, merely referencing the post-conviction rights set forth in the order. Because he was unaccustomed to the difference in the federal system, he overlooked the secretary's omission of the information, including the appointment of any other counsel for appeal. He regretfully noted that his acute awareness of the limited federal appellate time period was the very

8

reason he had had taken pains to ensure that the letter be drafted and mailed immediately.

Mr. Freeman testified that he never received any letter from petitioner requesting that he file an appeal. He believed this to be true because there was no letter in the file and he did not recall ever receiving one. He testified that he had received several letters from petitioner in the past, but those were all sent after the plea but before sentencing. Those letters were written after petitioner's bond was revoked, and were regarding quickly scheduling sentencing, "which we didn't get done as quickly as he wanted."

Mr. Freeman further testified that although he did recall having had some phone conversations with petitioner's parent(s) after the sentencing, they were about ancillary matters such requests for copies of things from the file or queries regarding the forfeiture. He denied ever having discussed an appeal with them and is certain that they never called him within the prescribed appellate 10-day period. He testified that he may have periodically left messages with them to have petitioner call him, or they may have called him and asked him to contact petitioner. He could not recall if petitioner's mother ever mentioned the issue of an appeal when she called, well after the appellate period, to request copies from the file. He further denied having spoken to the mother of one or more of petitioner's children about an appeal, although he recalled having spoken to her at some point. He could not say for certain whether it was before or after sentencing, but was certain it had nothing to do with the case and believed the conversation was about the young woman and petitioner getting married. He denies ever telling anyone that he would file an appeal for petitioner, or that he would consider doing so, if petitioner would just get in touch with him. He testified that he never received any letters or other communication from any of petitioner's family members or girlfriends, indicating interest in an appeal. He testified that the only person he ever discussed an appeal with was petitioner himself. He did not keep records of any of the calls from petitioner's family members or from the young woman who called about marrying petitioner.

Mr. Freeman denies ever making a comment to petitioner to the effect that he was "no longer my problem." He reports that he may have told him that he no longer represented him, but that he

9

would never have and did not refer to him as a problem, "because Randy never was with me."

Mr. Freeman admits that his final letter insufficiently documented the advice given to petitioner regarding his appellate rights. However, he advises the Court that he believes that his final April 24, 2008 disengagement letter, together with the discussions he had with petitioner immediately before and after the sentencing hearing, were sufficient to terminate his representation with petitioner and fulfil his responsibilities to consult with petitioner about an appeal. He admits that he was unfamiliar with the brief procedure required for drafting and filing a notice of appeal in federal court. He testified that there was never any discussion with petitioner regarding appealing any of the adverse rulings on his objections to the PSR, nor did petitioner ever ask if he could appeal them.

### III. Discussion

When a criminal defendant instructs counsel to file an appeal and the appeal is not filed, counsel is considered *per se* ineffective. Roe v. Flores-Ortega, 528 U.S. 470, 476-77 (2000). Additionally, the Fourth Circuit maintains that counsel must file an appeal if asked, "even if doing so would be contrary to the plea agreement and harmful to the client's interests." United States v. Poindexter, 492 F.3d 263, 273 (4th Cir. 2007).

The standard for establishing ineffective assistance of counsel is the familiar standard articulated in Strickland v. Washington, 466 U.S. 668 (1984). The defendant must establish that counsel's acts or omissions "were outside the range of professionally competent assistance." Id. at 690. Judicial scrutiny of counsel's performance is "highly deferential," and the Court must avoid second guessing counsel's strategy for obtaining a favorable result for the client. Id. at 689. The burden is on the defendant to prove, by a preponderance of the evidence, that counsel's performance was unreasonable. Id. at 687 - 88. The reasonableness of counsel's performance is an objective inquiry. Id. at 688.

After an evidentiary hearing on whether counsel was instructed to file a Notice of Appeal, Poindexter requires the Court to determine whether the defendant unequivocally instructed his

attorney to file a Notice of Appeal or, if his attorney was not so instructed, the court will determine if petitioner meets his burden of showing that: (1) his attorney had a duty to consult under Roe v. Flores-Ortega, 528 U.S. 470; (2) his attorney failed to fulfill his consultation obligations; and (3) he was prejudiced by his attorney's failure to fulfill these obligations. Poindexter, 492 F.3d at 273.

This Court finds it difficult to maintain that the defendant's entire testimony and evidence in the record supports the conclusion that he gave an unequivocal instruction for Mr. Freeman to file an appeal. Mr. Rohrbaugh's testimony regarding the phone calls he made from the jail within the seven days after the sentencing hearing differs substantially from his prior statement in the affidavit attached to his supplemental motion. In his affidavit, he claims that he did get through to counsel's office several times when he called from the jail, but was told that counsel was "not in." In contrast, his testimony at the evidentiary hearing was that his calls were not accepted *at all*, because collect calls from the jail were routinely blocked at Mr. Freeman's office. This testimony was confirmed by counsel. Moreover, the affidavits provided by his parents[14] are suspect, because not only do they fail to provide dates on when their alleged calls to petitioner's counsel about an appeal were made, their claims (that counsel told them he would file the appeal but would be unable to help thereafter, because he was leaving the firm to take the Marion County Prosecutor's job) lack credibility. Counsel's testimony on the subject was that he did not leave his firm for the new position until thirteen or fourteen months *after* the sentencing hearing, when the filing of a notice of appeal would have long been moot. Nevertheless, this Court does find that the defendant has met his three prong burden under Poindexter.

The first prong requires a showing that an attorney had a duty to consult under Roe v. Flores-Ortega. Accordingly, Roe v. Flores-Ortega states that "counsel has a constitutionally imposed duty to consult with [a] defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal . . . or (2) that this particular defendant reasonably demonstrated

---

[14] The affidavit from petitioner's girlfriend RoseAnne Carr on the matter will not be considered as it is not notarized, and being unsworn, does not meet the standard for unsworn declarations set forth in 28 U.S.C.S. § 1746.

11

to counsel that he was interested in appealing. 528 U.S. at 480.

Mr. Foreman made it abundantly clear that he believed a rational defendant would not want to appeal because, as Mr. Freeman read the plea agreement, defendant waived his right to appeal on any ground and the statutory sentence was non-negotiable. However, Mr. Freeman still had a duty to consult with this defendant about an appeal because there was reason to believe that this particular defendant demonstrated an interest in appealing. Defendant expressed his interest in appealing on at least three occasions. Although the defendant denies it, counsel testified that the first was during their meeting in the holding cell prior to the sentencing hearing. The second, to which petitioner and Mr. Freeman both agree, occurred in the courtroom immediately after sentencing. The third, which petitioner denies, Mr. Freeman testified occurred back in the holding room after sentencing. While there is conflicting testimony on what transpired on this day, all accounts evidence that defendant expressed an interest in appealing. This requires counsel to consult. If Mr. Freeman's recollection is accepted, where defendant inquired about the possibility of appealing before the hearing, then it demonstrates defendant's interest in filing an appeal. Mr. Freeman had not yet been discharged, so there would be no reason for defendant to accept the Court's offer, made near the end of sentencing, to have the Clerk to file a Notice of Appeal; Mr. Freeman was still counsel of record, familiar with defendant's case, and capable of filing an appeal. If defendant's recollection is accepted, where filing an appeal was discussed at the immediate conclusion of the hearing, then it demonstrates a continued interest in filing an appeal. Mr. Freeman's testimony was that petitioner again raised the issue after sentencing, back in the holding cell area. Petitioner's unhappy nod when Mr. Freeman re-explained why he could not represent him on appeal might merely demonstrate that defendant was upset and uncertain of how to proceed with the appeal. Because defendant continued to bring up the appeal issue, a reasonable attorney would think that this particular defendant was interested in filing an appeal, despite the fact that the attorney viewed it as an unwise move.

The second prong requires a showing that counsel failed in his consultation obligations. The Supreme Court notes that "a defendant who explicitly tells his attorney not to file an appeal plainly

12

cannot later complain that, by following his instructions, his counsel performed deficiently." Roe v. Flores-Ortega, 528 U.S. at 477. However, the Seventh Circuit observed that no court has ever held that "a defendant who initially indicates that he does not wish to appeal cannot reasonably expect counsel's assistance if the defendant has a change of heart before the window to file an appeal closes." Corral v. United States, 498 F.3d 470, 473 (7th Cir. 2007). Specifically, the Seventh Circuit held that defense counsel should remain reasonably available to his client during the ten-day window for filing a Notice of Appeal. Id. at 474.

This Court finds that counsel did not remain reasonably available to defendant. Upon Mr. Freeman's own admission, he terminated his representation of the defendant at the conclusion of the sentencing hearing when he sent the April 24, 2008 disengagement letter that failed to include within it the information about petitioner's limited appellate rights. Defendant's testimony that he placed several collect calls to counsel from the jail within the first seven days after sentencing, that were blocked by Mr. Freeman's office is questionable. This testimony contradicts his own prior sworn statement in his affidavit. Nevertheless, Mr. Freeman's testimony was that any calls from the jail were automatically blocked, so even assuming, *arguendo*, that petitioner's testimony was true and his affidavit was false, he could not have reached counsel directly by phone.[15]

Likewise, this Court is unable to determine whether in fact petitioner actually sent *a* letter requesting an appeal to counsel from the jail within the seven day period he remained there. This testimony also contradicts petitioner's prior § 2255 motion and supplement statements, where he alleged that "after sentencing, counsel led the petitioner on like he was going to help him. Told him to send a letter stating what he needed and what he wanted to do. Counsel ignored *several of petitioner's letters* and in a phone conversation almost 5 months later,[16] told defendant that he was

---

[15] The Court finds that defendants' parents' affidavits do not support a conclusion that petitioner attempted to indirectly reach counsel by phone within the 10-day appellate period, because the information included in the affidavits about Mr. Freeman's new position suggests that their calls, if made at all, were likely made well after that.

[16] Petitioner's testimony at the hearing was that this alleged statement by counsel was made in a phone call approximately one month, not five months later.

no longer his problem." (Dkt.# 109 at 10) (emphasis added). Furthermore, petitioner testified that he received no further communications from counsel during the 10-day appellate period, after his one in-courtroom, face-to-face request to counsel for an appeal. However, when confronted on cross-exam with the April 24, 2008 disengagement letter (Government's Exhibit 2), he admitted that he had in fact received it, the day after sentencing. The letter clearly advised that Mr. Freeman was no longer representing him. Under the circumstances, his affidavit's claim that he called counsel after he was finally transferred to the prison to ask "why he hadn't responded to my letter *that I thought he was my attorney*" (Dkt.# 167-1 at 2) (emphasis added) and his claims that he wrote to counsel (one or more times, depending on which of his versions of the events is to be believed), asking that an appeal be filed, are questionable.

Accordingly, notwithstanding all of the discrepancies in the testimony and evidence, the Court finds that counsel did not remain reasonably available to defendant during the ten-day appellate period. This Court does not believe that counsel should have maintained a ten-day vigil with his telephone. Nevertheless, there was reason to believe that this defendant may have wanted to appeal, and Mr. Freeman did not specifically inquire whether he did in fact want to do so. Further, the Court believes that the better course of action for Mr. Freeman would have been to take the *de minimis* step of filing the notice of appeal to protect his client's interests and then withdrawing from the case. Whether petitioner did actually place the calls from the jail within the appeal time or not, it is undisputed that counsel's jail-call-block policy rendered it impossible for petitioner to reach him by phone. Thus, counsel failed in his obligation to consult.

The final prong requires a showing that defendant was prejudiced by his attorney's failure to fulfill his consultation obligations. In this regard, prejudice is simply shown because counsel's failure to fulfill his obligations deprived defendant of his procedural right to file a Notice of Appeal. See United States v. Peak, 992 F.2d 39, 41-42 (4th Cir. 1993).

Defendant has met his burden in showing all three prongs of the Poindexter test.

## IV. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that defendant's original judgment be vacated and new judgment entered from which an appeal can be taken. See United States v. Peak, 992 F.2d 39, 42 (4th Cir. 1993).

Within **fourteen (14) days** after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985): United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Opinion/Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as shown on the docket. The Clerk is further directed to provide copies of this Opinion/Report and Recommendation to counsel of record via electronic means.

DATED: March 10, 2011

_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE